UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------x
SEAT SACK, INC.,

                                            07 Civ. 3344 (DFE)
                    Plaintiff,
                                            (This is an ECF case.)


          - against -
                                            OPINION AND ORDER

CHILDCRAFT EDUCATION CORP., and
SCHOOL SPECIALTY, INC.,

                    Defendants.
-----------------------------------x

DOUGLAS F. EATON, United States Magistrate Judge.

        Plaintiff Seat Sack, Inc. has alleged thirteen causes of
action against the two defendants:  Childcraft Education Corp.
("Childcraft") and School Specialty, Inc. ("School Specialty").

        In February 2008, I denied Plaintiff's motion for a
preliminary injunction.  On January 27, 2009, the defendants
filed a motion for summary judgment.  (Docs. ##50-58.)  On
February 13, 2009, Plaintiff filed a cross-motion for summary
judgment.  (Docs. ##59-63.)  On February 26, 2009, the defendants
filed reply papers. (Docs. ##64-66.)  On March 5, 2009, Plaintiff
filed additional papers.  (Docs. ##67-69.)  On March 12, 2009,
the defendants filed a motion to strike Doc. #67 and Doc. #69.
(Docs. #70-71.)  On March 13, 2009, Plaintiff filed papers
opposing the motion to strike.  (Docs. ##72-73.)

        For the reasons set forth in today's Opinion and Order, I
deny the defendants' motion to strike (Doc. #70), I grant the
defendants' motion for summary judgment (Doc. #50), and I deny
Plaintiff's cross-motion for summary judgment (Doc. #59).  I am
today entering a Judgment in favor of the defendants.


                    The Parties

        Childcraft is a New York corporation headquartered in
Pennsylvania.  At all relevant times, it has been a wholly-owned
subsidiary of School Specialty, a Wisconsin corporation.  (SOF
¶1.)[1]  School Specialty markets and sells educational products,

─────────────────
        [1]  "SOF" refers to Doc. #51, Defendants' Local Civil Rule
56.1 Statement of Material Facts.

programs and services to schools through various brands, including the "Childcraft" brand. (SOF ¶¶2-3.) Childcraft markets and sells thousands of various educational products through its catalog, website, and sales staff. (SOF ¶4.)

Plaintiff is Florida corporation wholly owned by Anne McAlear. In the early 1980's, she owned a company called The Nursery Collection, which manufactured infant bedding. Its number of employees grew from 3 to 38, and she sold the company around 1994. (4/4/08 McAlear Depo. Tr. 9-10.) In 1993, she designed the Seat Sack. In 1995, she retained a patent attorney and the U.S. Patent Office issued a design patent to her. The Seat Sack is a sack that drapes across the back of a student's chair and holds school supplies. She began manufacturing it and selling it in 1995. In 1998, she started selling it to schools in large cities, including New York City. In 1999, she incorporated the business and hired one employee. (McAlear Depo. Tr. 14-25.)

<u>The Contractual Relationship
Between Plaintiff and Childcraft</u>

At her deposition, Ms. McAlear vaguely recalled having conversations with Childcraft's Liz Plotkin prior to late January 2000: "I agreed to send samples and literature and pricing to her to see – - she was going to see about putting it [the Seat Sack] in the catalogue. That's pretty much all of our first conversation." (McAlear Depo. Tr. 23-24.)

Q: .... Do you recall the substance of any other conversations with her other than your initial conversation?

A: Not really.

Q: Did you ever make any notes of conversations with Ms. Plotkin?

A: No.

(McAlear Depo. Tr. 41-42.)

In late January 2000, Childcraft's Liz Scott sent Ms. McAlear a one-page form entitled "Childcraft Education Corp. Exclusives – - Growing Years Catalog" (the "Agreement"). On January 28, 2000, after the word "Vendor," Ms. McAlear wrote "Seat Sack Inc." (the name of her corporation), and she signed the form as President. (SOF ¶6.) Childcraft has entered into this type of agreement with hundreds of vendors for the sale of

thousands of products that are featured in Childcraft's catalogs. (SOF ¶8.)  The document said, in pertinent part:

EXCLUSIVITY:  We [Childcraft] are requesting information on the items listed below which are featured in Childcraft Education Corp.'s Growing Years Catalog.  Terms of exclusivity include:

CODE A.  EXCLUSIVE PRODUCTS UNDER CHILDCRAFT LABEL: Products manufactured for Childcraft by other manufacturers/vendors and labeled with the Childcraft name.

CODE B.  EXCLUSIVE PRODUCTS NOT BEARING CHILDCRAFT LABEL but manufactured by a vendor who has given Childcraft the exclusive right to be the "sole source" of the product.  .....

CODE C.  EXCLUSIVE COLLECTIONS:  .....

Please sign this page (or respond in writing if items are not exclusive to Childcraft) and return AS SOON AS POSSIBLE to Liz Scott at the fax number below.

Thank you for your prompt response to this request.

| Product Description | Childcraft Item # | Vendor Item # | Exclusivity Code |
|---|---|---|---|
| SEAT SACK | #370631 | seatsack3 | A |

This letter is to confirm exclusivity of the vendor's product(s) listed created for Childcraft Education Corp.  .....

It is undisputed that the Seat Sack was classified under "Exclusivity Code A."  Ms. McAlear testified as follows:

Q:  Isn't it true that when the idea of exclusivity came up, your belief was that Childcraft was asking that you sell to Childcraft and to no one else?

A:  Yes, it was.

Q:  And then you called Liz Scott to talk about that, right?

A:  Yes.  And that's where all of this conversation

-3-

came from.

Q: What Ms. Scott told you in that conversation is no, that's not accurate, we're asking for the right to exclusively sell only those Seat Sacks that have the Childcraft name on them, isn't that true?

A: Right.

(McAlear Depo. Tr. 73.)

On those Seat Sacks which Plaintiff manufactured for Childcraft, the name "Seat Sack" was written in large print on the outside of the product; inside the product, Plaintiff placed a small Childcraft label with instructions about how to re-order the product from Childcraft. (McAlear Depo. Tr. 47-48.) Plaintiff added this label only to those Seat Sacks that were sold to Childcraft. (*Id.*; Pl's Resp. to Interrog. No. 2, attached as Exh. C to Doc. #56.)

Ms. McAlear testified as follows. The Agreement did not require Childcraft to buy Seat Sacks from Plaintiff. Childcraft never committed to buy a minimum number of Seat Sacks. (McAlear Depo. Tr. 53.) Plaintiff was free to sell Seat Sacks to other customers, provided that those Seat Sacks did not bear a Childcraft label. (*Id.* Tr. 73, 77.) At any time, Plaintiff could have told Childcraft that Plaintiff was no longer interested in selling to Childcraft, and Plaintiff could have requested that the Seat Sack not be placed in the Childcraft catalog. (*Id.* Tr. 90-91.)

> The Course-of-Dealing Relationship
> Between Plaintiff and Childcraft

During the years from 2000 to 2005, Childcraft purchased thousands of Seat Sacks from Plaintiff. (Doc. #57, 8/23/07 Murphy Decl. ¶¶5, 16, 18.) The purchases were made as follows. Childcraft would send a purchase order to Plaintiff, which would then manufacture and ship the requested Seat Sacks to Childcraft, together with an invoice. Childcraft always paid the invoices, and Plaintiff admits that Childcraft owes no money on any of Plaintiff's invoices. (McAlear Depo. Tr. 83-84, 99.)

The Seat Sacks purchased by Childcraft became part of the inventory of Childcraft, which in turn sold the Seat Sacks through Childcraft's website and catalog. (Murphy Decl. ¶¶6, 19.) Once Childcraft paid Plaintiff's invoice, it is undisputed that Childcraft was free to resell the Seat Sacks at any price it

chose.  And Plaintiff was not entitled to any more payments, such as a percentage of Childcraft's retail sales.  (McAlear Depo. Tr. 37, 84, 88-89.)

Prior to Childcraft, Ms. McAlear had marketed through Babies R Us (it appears that this was only in connection with her prior company The Nursery Collection).  (McAlear Depo. Tr. 39.) Starting in 2000, Childcraft was Plaintiff's largest customer. Plaintiff started a small website in 2000, but it did not have the capacity to take an on-line order until around the end of 2003.  Plaintiff's annual sales increased from roughly $10,000 in 1999 to more than $20,000 in 2000.  In each of the next four years, Plaintiff's sales increased by 49% or more.  By contrast, the annual growth was only about 8% in 2005 and 2006, and Plaintiff's sales declined 5% in 2007.  (McAlear Depo. Tr. 26-32.)

For the year 2004, Plaintiff's top four customers were: Childcraft (approx. $90,000), School Specialty (approx. $66,000), School Specialty's other divisions (approx. $10,000) and a company named Demco (approx. $6,000).  Plaintiff's sales to Childcraft declined in 2004 and stopped in 2005.  (2/12/09 McAlear Aff. ¶9.)  However, for the year 2007, School Specialty (the parent company of Childcraft, named as a defendant in the Complaint filed 3/5/07) was "probably" Plaintiff's top customer, and it was still a customer as of 2008.  As of 2008, Plaintiff had 3,000 customers, by Ms. McAlear's rough estimate.  (McAlear Depo. Tr. 159-62.)

Around 2000, Ms. McAlear's attorney invoked her design patent and sent a cease-and-desist letter to a company that was selling a similar product called the "Aussie Pouch."  That company's attorney declined to stop, and Ms. McAlear decided not to sue.  (McAlear Depo. Tr. 65-66.)

Significantly, Ms. McAlear knew that Childcraft's parent company (the co-defendant School Specialty) was the distributing agent for the Aussie Pouch.  She did not object to that, and her company continued to sell the Seat Sack to School Specialty as well as to Childcraft.  "Aussie Pouch and School Specialty were together long before I sold to Childcraft.  Why would I dispute that?"  (McAlear Depo. at Tr. 58.)

At Tr. 60, Ms. McAlear answered the following question:

Q:  Let's think then about 2002.  Just pluck a year out of the air before the Seat Pocket ever became an issue. According to your understanding of Seat Sack's

-5-

relationship with Childcraft, if the 2002 Childcraft
catalogue had included both the Seat Sack and the
Aussie Pouch would that have violated any agreement
between Childcraft and Seat Sack?

A:  No.  ....

However, at Tr. 61, there was a lunch break in the
deposition.  After lunch, she recanted the "No" answer she had
given at Tr. 60.  At Tr. 63, she said:  "We had more of a
fiduciary type of relationship."  At Tr. 69, she said that she
had mixed up the "right to sell" with "my relationship with
Childcraft."  (Tr. 69.)  At Tr. 66, she asserted that
Childcraft's Liz Scott had said "that there would be no
competition."  Ultimately, however, Ms. McAlear could not recall
Ms. Scott ever saying that Childcraft would not sell competing
products.  Ms. McAlear testified:

Q:  ....  Without regard to the Aussie Pouch or any
other specific competitor, what did Ms. Scott say to
you that led you to believe that Childcraft would not
sell competing products?

A:  That they would just do - - it was an agreement
that they would do their best to sell my product, and I
would do my best to manufacture my product and get it
to them in a timely manner.  (Tr. 67.)

*   *   *   *   *

Q:  I want to be very clear here.  What I'm asking
about right now is any conversations that you had with
Ms. Scott.  What did she say in those conversations
that led you to believe that Childcraft would not sell
a competing product?

A:  The exclusivity, when we talked about the exclusive
right to sell.  That was when we discussed whether they
would sell another product that was the same as mine.

Q:  Did you ask about that?

A:  Well, I asked her - - I said to her, "If I'm
selling these to you and you want to be exclusive, why
would I do that?"  And she told me the team of
salespeople they had, the amount of catalogues they had
going out, how they would do their best to sell my
product.

She didn't say I'm going to do my best to sell your product *and* I'm going to bring in the Aussie Pouch. Sometime it's the things you don't say. (Tr. 67-68, emphasis added.)

* * * * *

Q: Did she ever say to you, again not in these words but in effect, we won't sell a competing product?

MR. CARROLL: Do you understand the question?

A: I understand the question. I'm thinking about the answer.

MR. CARROLL: That's fine.

A: Whether she actually said it or it was implied, I'm sorry, *I can't even tell you if it was actually said or implied.* (Tr. 70-71, emphasis added.)

Central to many of Plaintiff's claims is Ms. McAlear's assertion that there was a "special relationship" between Childcraft and Plaintiff. She may have believed that such a relationship existed, but such belief was not based on anything that Childcraft said or did. She testified:

Q: You said that if customers would contact you, you would refer them to Childcraft?

A: Yes.

Q: Is that something Ms. Scott asked you to do?

A: Also maybe it was *implied* if you have a customer like that that you had a relationship with. (Tr. 71, emphasis added.)

* * * * *

Q: You were free to sell Seat Sacks without the Childcraft name to anyone you wanted, correct?

A: Without the Childcraft name[.] But we didn't promote them to other companies like we did to Childcraft.

Q: But that was *your decision*, wasn't it?

A: It was a relationship we had. It was like you
don't go and tell another woman how beautiful she is
when you're married. You just don't. It's a different
relationship. Or seeking someone else.

Q: Did Ms. Scott ever tell you[:] while you're free
to do so, we really would prefer it if you didn't sell
to anyone else?

A: She said that they wanted to be first, they wanted
their products out there first. .... (Tr. 73-74,
emphasis added.)

*  *  *  *

Q: .... As you sit here right now, do you recall any
other conversations with Ms. Scott in which she said
something that led you to believe that this was a
special relationship?

A: Every conversation we had led me to believe it was
a special relationship. *Just that she called me* was a
special relationship. If the president of Wal-Mart
called you, don't you think you'd have a relationship
with them? [2]

Q: Anything other than the fact that she called you?

A: It's eight years now. Let me think.

Q: Take your time.

A: The conversation I had with her asking her if I
could direct the people to Childcraft for any of my
specials and that I would reduce Childcraft's price.
I didn't do that to anyone else.
     Childcraft was the only one paying $3.95.
Everyone else was paying $4.95. There was never a
special or any advertising that I did that had a
special that went to anyone else but Childcraft.

Q: The special price was *your idea*, right?

---

[2]     There is no claim that Liz Scott was president of
Childcraft. Ms. McAlear testified that she is not sure what
position Ms. Scott held within Childcraft, simply that Ms. Scott
was Childcraft's contact with Plaintiff. (McAlear Depo. Tr. 34-
35.)

A:  *Yes, it was*.  It's like having a realtor and you
lower your price to sell.  It's like the relationship
you have with your realtor.

Q:  Any other conversations that come to mind that you
can recall with Liz Scott or anyone else at Childcraft
that led you to believe that this was a special
relationship?

MR. CARROLL:  A continuing objection to what a
"special relationship" is.

A:  I think I have told you all of them.  Let me think.
(Tr. 81-83, emphasis added.)

As mentioned earlier, right after the lunch break, Ms.
McAlear asserted that Plaintiff and Childcraft had "more of a
fiduciary type of relationship."  (Tr. 63.)  "Fiduciary" is a
word that carries extraordinary consequences, but questioning
revealed that she was trying to apply that word to a very
ordinary relationship with a large customer.  At Tr. 72, she was
questioned as follows:

Q:  First of all, can you describe what you mean
when you say "fiduciary relationship"?  What do
you mean by that?

A:  It would be a relationship that we agreed upon
that we – – how can I explain this – – that we were
both in agreement of.

Q:  In what way was that relationship different than
another relationship with a mom and pop store?

A:  A mom and pop store never said to me ... I'm
going to give all of my efforts to sell your product
and you give your efforts to deliver to me and
help us to sell your product, you have to give us
samples.  Mom and pop stores wouldn't do that, ....

Q:  Sending samples to salespeople, that's a tool
to sell Seat Sack, correct?

A:  Right.

(McAlear Depo. Tr. 72.)

<u>Childcraft's Introduction of the Seat Pocket</u>

It is undisputed that Plaintiff was entitled to sell the Seat Sack (without the Childcraft label) to anyone that Plaintiff chose. Childcraft alleges that it discovered, in 2003, that Plaintiff was offering to sell the Seat Sack to Childcraft's competitors at a price lower than the price at which it sold to Childcraft, and that Plaintiff was offering the Seat Sack for sale directly to teachers at a price lower than offered in the Childcraft catalog. (SOF ¶¶27-28.) Plaintiff disputes this, but it is unnecessary to resolve that dispute. Regardless of who is right about that dispute, Childcraft was free to offer the public both the Seat Sack and a competing product. The competing product could be manufactured by one of Childcraft's other suppliers, or by Childcraft itself.

In July 2003, Childcraft began developing its own competing product. It is not radically different from the Seat Sack, but it contains two additional storage pockets and this creates a distinctive appearance; when it is draped on a chair and is viewed from the rear, the two pockets mimic the appearance of the two rear pockets on the seat of a pair of pants. Childcraft named its product the "Seat Pocket." Ms. McAlear would have felt less aggrieved if Childcraft had taken three steps: if Childcraft had eschewed the word "Seat" and named the new product something like "Chair Pocket," if Childcraft had kept its retail price for the Seat Sack at $9.95 rather than increasing it to $11.95, and if Childcraft had given Ms. McAlear specific notice about what it was doing. But the legal question is whether Childcraft was required to take any of those three steps.

Childcraft began offering the Seat Pocket for sale through its catalog in January 2004. (SOF ¶32.) During 2004 and 2005, Childcraft continued to offer both Seat Sacks and Seat Pockets for sale. (Doc. #57, Murphy Decl. ¶16.) Childcraft's last purchase of Childcraft-branded Seat Sacks occurred in or about September 2005. (*Id*. ¶18.) Plaintiff says that it did not learn about the existence of the Seat Pocket until 2006.

On March 5, 2007, Plaintiff filed its Complaint in Supreme Court, New York County. The defendants removed the case to our Court on the basis of diversity of citizenship. Plaintiff says that our Court should apply the laws of New York to this lawsuit except for the claims of trademark infringement and design patent infringement. Defendants' 1/27/09 memorandum, at page 16, fn. 5, says: "For purposes of this motion only, and without waiving any rights with respect to the choice of law, Childcraft Defendants

will assume New York law applies."

<u>Additional Facts Relevant to</u>
<u>Plaintiff's Trademark Claims</u>

    Exhibit J to Ms. McAlear's 2/12/09 affidavit is a printout from the Trademark Electronic Search System ("TESS") of the U.S. Patent and Trademark Office. It shows that Plaintiff applied to register the word mark "Seat Sack" on May 15, 2000 but abandoned the application on February 5, 2002. It also shows that Plaintiff again applied to register the word mark "Seat Sack" on August 18, 2006, but that registration has not been granted to Plaintiff, who is still described by TESS as an "Applicant" rather than as a "Registrant."

    Plaintiff chose the name "Seat Sack" because the product is a sack that works in conjunction with a seat. Likewise, Plaintiff chose names for its other products that describe the function of those products. Thus, Plaintiff sells a "File Drawer Sack," and chose the name because the product is a sack that hangs on a file drawer. Plaintiff also sells a "Locker Sack," which it named because the product is a sack that hangs inside a locker. Plaintiff's "Office Sack" was so named because it is a sack that is designed for use in an office or cubicle. The "Lock-n-Sack" is designed for use in or on a child's locker, and Ms. McAlear chose that name because that product "locked and it was a sack, and 'Sack' was my name." (McAlear Depo. Tr. 126-27.)

<u>Additional Facts Relevant to Plaintiff's</u>
<u>Claim of Design Patent Infringement</u>

    Ms. McAlear owns a design patent issued by the U. S. Patent and Trademark Office bearing number Des. 358,731, dated May 30, 1995 (the '731 Patent). There is no evidence of any written assignment of the design patent from Ms. McAlear to her corporation. (SOF ¶70.) She incorporated her business in 1999. (McAlear Depo. Tr. 7-8.)

    The '731 Patent claims an "ornamental design for sack for hanging on the back of a chair, as shown." The black and white drawings and figures in the patent depict an unadorned pouch from various angles. No other ornamentation is shown. (Exh. A to the 2/12/09 McAlear Affidavit.)

    Plaintiff testified that "anything that would go on the back of a chair I had an exclusive right to." (McAlear Depo. Tr. 65.) However, her attorney's memorandum of law makes no claim that she or her corporation has such a broad right.

Additional Facts Relevant to
Plaintiff's Trade Secrets Claim

Count IV alleges that Childcraft misappropriated Plaintiff's trade secrets.  According to Ms. McAlear, the alleged trade secrets are: "My design, my patent, the people that we were selling it to that I had them go directly to Childcraft." (McAlear Depo. Tr. 100.)

She admits that anyone holding a Seat Sack can see its design.  (*Id.* Tr. 101.)  Similarly, the design patent for the Seat Sack is a public record available for the world to see, as Ms. McAlear again admits.  (*Id.* Tr. 103.)  As for the names of customers that she had previously been selling to, it seems clear that she provided those names to Childcraft; there is no evidence that Childcraft "misappropriated" those names.  (*Id.* Tr. 103.)

## SUMMARY JUDGMENT STANDARDS

On a motion for summary judgment, we are not talking about the adequacy of Plaintiff's pleadings; we are talking about the adequacy of Plaintiff's evidence.  Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).  Summary judgment is the "put up or shut up" time for the party that brought the lawsuit.  *See Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (*quoting* FLEMING JAMES, JR. & GEOFFREY C. HAZARD, JR., CIVIL PROCEDURE 150 (2d ed. 1977)).  Accordingly, "the plain language of [Rule] 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

When opposing a motion for summary judgment, a plaintiff that has given testimony in a deposition cannot create a triable issue of fact by merely submitting an affidavit that contradicts the plaintiff's deposition testimony.  *Perma Research & Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969); *see also Hayes v. New York City Dep't of Corrections*, 84 F.3d 614, 619 (2d Cir. (1996).

The Complaint lists 13 causes of action, but I will refer to them as "counts" for the sake of brevity, since that is the terminology used in the Defendants' 1/27/09 memorandum of law (Doc. #58). Also, I will address the 13 "counts" under five main headings. Essentially, I will put these main headings in the order used in Doc. #58, except that I will reverse the order of the fourth and fifth headings.

<u>First</u>, I will address the claims that are resolved by reference to the contract, including the claims for breach of contract (Count V), breach of fiduciary duty (Counts IV and VI), conversion (Count III), and unjust enrichment (Count XIII). <u>Second</u>, I will address the fraud claims (Counts I and II). <u>Third</u>, I will address the trade secrets claim (part of Count IV). <u>Fourth</u>, I will address the claims of infringement of the design patent (parts of Counts VII and VIII). <u>Fifth</u>, I will address the trademark infringement claims and related claims (Counts VII through XII, and part of Count IV).

**FIRST (as to Counts III through VI, and XIII):**
**Plaintiff's Evidence Fails to Show Any Breach of**
**Contract, or Breach of Fiduciary Duty, or Conversion,**
**or Unjust Enrichment.**

The testimony of Plaintiff's president, Ms. McAlear, does not contradict the declarations of Childcraft: the relationship between Plaintiff and Childcraft was an ordinary, run-of-the-mill, arms' length agreement for the purchase of goods. The parties did not have a "special" relationship. Childcraft undertook no extraordinary obligations to safeguard Plaintiff's interests or to act as Plaintiff's "fiduciary."

A. <u>The Relationship between Plaintiff and Childcraft</u>
   <u>Was Ordinary, Not "Special" or "Fiduciary."</u>

The Seat Sack was just one of thousands of products that appear in Childcraft's catalogs. (Doc. #53, Suchodolski Decl. ¶6.) And Plaintiff was one of hundreds of vendors who sold products through those catalogs. (*Id.*) Nevertheless, Plaintiff argues that its relationship with Childcraft was "special," and even "fiduciary." But Plaintiff's evidence does not support that argument.

In Doc. #60, Ms. McAlear's 2/12/09 affidavit, at ¶7, she says: "I was told in numerous discussions by Liz Scott and Lois Plotkin, Childcraft's representatives, that Childcraft would act

as Seat Sack, Inc.'s distributing agent and that Childcraft would use its best efforts to sell 'Seat Sacks' ...." For purposes of ruling on summary judgment, I assume that Childcraft made such statements. But such statements occurred in the undisputed context that Childcraft was purchasing for its own inventory, and was free to charge its customers whatever retail price it chose.

B. <u>Contrary to Count V, Childcraft</u>
<u>Did Not Breach Any Contract with Plaintiff.</u>

The periodic purchase orders and invoices obligated Childcraft to pay Plaintiff for the Seat Sacks, and there is no claim that Childcraft breached that obligation. The 2/12/09 affidavit of Ms. McAlear submits Exhibit J, a one-page Childcraft form entitled "2003 Vendor Profile." Its third line said: "Vendor partnership agreement for calendar year 2003. The completion of this agreement will factor into all new product decisions." Despite that one use of the word "partnership," the document did not create any partnership in the legal sense of sharing risks and liabilities. To the extent that it was a contractual agreement, the document imposed obligations on Plaintiff as Vendor. For example, the document asked "Do you sell directly to schools?" and Plaintiff answered "No"; the document asked "Do you have a current Certificate of Insurance?" and Plaintiff answered "Yes."

Plaintiff does not specify any contractual obligation that was breached by Childcraft or its parent company. The defendants are entitled to summary judgment on Count V of the Complaint.

C. <u>Contrary to Counts IV and VI, Childcraft Did Not</u>
<u>Undertake or Breach a Fiduciary Duty to Plaintiff.</u>

Count IV's heading alleges "Deceptive Trade, Unfair Business Practices, Misappropriation of Trade Secrets, and Unfair Competition." Count IV accuses the defendants of "gross malice" and "deceptive trade and practices while acting as plaintiff's distributor and fiduciary." (Compl. at ¶35.) Count VI's heading seeks attorneys fees and costs. It accuses the defendants of "fraudulent actions ... while acting as a fiduciary and in breach of that duty to the plaintiff[.]" (Compl. at ¶42.)

In *Pan Am. Corp. v. Delta Air Lines, Inc.*, 175 B.R. 438, 511-12 and n.64 (S.D.N.Y. 1994), Judge Patterson wrote:

> .... [W]hen "parties deal at arms length in a commercial transaction, no relation of confidence or trust sufficient to find the existence of a

fiduciary relationship will arise absent extra-
ordinary circumstances." [citations omitted] An
ordinary contract is generally insufficient to
give rise to a special relationship. [citation
omitted]

.... Knowledge of a party's financial position
is inadequate as a matter of law to create a
fiduciary relationship. Rather, some form of
control over or entrustment of a party's finances
is necessary. *See Chipman v. Steinberg*, 106 A.D.2d
343, 345, 483 N.Y.S.2d 256, 258 (1st Dep't 1984)
(to create a fiduciary relationship, one party must
entrust its money, property or services with another),
*aff'd*, 65 N.Y.2d 842, 493 N.Y.S.2d 129 (1985).

Judge Patterson's opinion was recently quoted with approval in
*DeBlasio v. Merrill Lynch & Co., Inc.*, 2009 WL 2242605, *28
(S.D.N.Y. July 27, 2009) (Sullivan, J.)

Plaintiff has the burden to show the existence of a
fiduciary relationship. Ms. McAlear's own testimony, which I
have quoted extensively, shows that the relationship between
Plaintiff and Childcraft was an ordinary, arms length
relationship between a vendor and a distributor. Plaintiff sold
thousands of Seat Sacks to Childcraft, which paid the invoices in
full. There was no entrustment.

The defendants are entitled to summary judgment on Counts IV
and VI of the Complaint.

D.   Contrary to Count III, Childcraft
_____    Did Not Commit Any Conversion.

Count III is a claim for conversion. It alleges: "That the
defendants have converted monies and the proceeds of sales due
plaintiff ... and ... defendants have taken possession ... [of]
proceeds from the sale of plaintiff's product and/or by sale of a
'knock-off product' monies due plaintiff ...." (Compl. at ¶
33.)

The Seat Sack product was manufactured by Plaintiff.
Plaintiff concedes that Childcraft paid all invoices for its
purchases, and that Plaintiff had no right to any portion of
Childcraft's retail sales. (McAlear Depo. at Tr. 88-89, 98-99.)

The Seat Pocket product was never manufactured or possessed
by Plaintiff. Count III seeks the proceeds of Childcraft's sales

-15-

of Seat Pockets.

The New York law on a claim for conversion is set forth in *Peters Griffin Woodward, Inc. v. WCSC, Inc.*, 88 A.D.2d 883, 883-84, 452 N.Y.S.2d 599, 600 (lst Dep't 1982):

> Conversion is an unauthorized assumption and exercise of the right of ownership of goods belonging to another to the exclusion of the owner's rights. [Citation omitted]  Money, if specifically identifiable, may be the subject of a conversion action.  [Citations omitted]  However, an action for conversion cannot be validly maintained where damages are merely being sought for breach of contract (10 N.Y.Jur., Conversion, §27).

> The plaintiff has never had ownership, possession or control of the money constituting the June commissions.  Therefore, no action in conversion may be brought ....

*Peters Griffin Woodward* was discussed in *Fantozzi v. Axsys Technologies, Inc.*, 2008 WL 4866054, *9 (S.D.N.Y. Nov. 6, 2008), where Judge McKenna granted summary judgment, dismissed a claim for conversion, and wrote:  "New York law is clear, seeking to enforce an 'obligation to pay' does not raise a claim for conversion."

The defendants are entitled to summary judgment on Count III of the Complaint.

E.  <u>Contrary to Count XIII, There Can Be No "Unjust Enrichment" in the Face of a Contract.</u>

Count XIII asserts a claim for unjust enrichment.  But Plaintiff and Childcraft were parties to the 1/28/2000 Agreement, as well as to purchase orders and invoices (all of which were paid).

The high court of New York has explained the New York law on unjust enrichment as follows:

> A "quasi-contract" only applies in the absence of an express agreement, and is not really a contract at all, but rather a legal obligation imposed in order to prevent a party's unjust enrichment [citations omitted].  Indeed, we have stated that: "....  Briefly stated, a quasi-contractual obligation is one imposed by law

> *where there has been no agreement or expression*
> *of assent, by word or act, on the part of either*
> *party involved.  ...."* [citation omitted].

*Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 388-89, 521 N.Y.S.2d 653, 656 (N.Y. Ct. App. 1987) (emphasis added by the *Clark* opinion).

Here, it is undisputed that the parties had a contractual relationship.  Plaintiff has not come forward with evidence that would allow a reasonable jury to conclude that the Defendants were somehow "enriched" by receiving a benefit or thing of value from Plaintiff that falls outside the subject matter of the parties' contract.  Accordingly, the Defendants are entitled to summary judgment on Count XIII of the Complaint.

**SECOND (as to Counts I and II):**
      **Plaintiff's Evidence Fails to Show Fraud.**

In *Schlaifer Nance & Co. v. Estate of Andy Warhol*, 119 F.3d 91, 98 (2d Cir. 1997), the Second Circuit wrote:

> Under New York law, for a plaintiff to prevail
> on a claim of fraud, he must prove five elements by
> clear and convincing evidence:  (1) a material
> misrepresentation or omission of fact, (2) made with
> knowledge of its falsity, (3) with an intent to defraud,
> and (4) reasonable reliance on the part of plaintiff,
> (5) that causes damage to the plaintiff.
>
> *              *              *
>
> ....  "Where sophisticated businessmen engaged
> in major transactions enjoy access to critical
> information but fail to take advantage of that access,
> New York courts are particularly disinclined to
> entertain claims of justifiable reliance." [Citation
> omitted]

In considering whether Plaintiff "justifiably relied" upon an alleged statement, a jury would consider the context, including Ms. McAlear's testimony that she previously owned an infant bedding company with 38 employees and had previously dealt with a major national distributor.

Counts I and II allege fraud in the inducement and fraud. Paragraph 12 alleges, in part:  "On, about or during the month of November, 1999, plaintiff, as a result of fraudulent

misrepresentations made by defendants, ... did enter into an agreement with the defendants, whereby plaintiff agreed to allow the defendants to act as its distributor for present and future sales of plaintiff's aforesaid 'Seat Sack,' ...." Paragraph 13 alleges: "Upon information and belief, on, about, or immediately proceeding [sic] the making of the aforesaid agreement," the Childcraft Defendants made false statements to Plaintiff. (Compl. ¶ 13.)

The Complaint, which was originally filed in New York state court, did not allege fraud with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure. It said that "defendants, through its/their agents and/or employees," made statements that:

    A. The defendants would at all times act as plaintiff's fiduciary and distributor and would protect and promote the best interests of plaintiff and its aforesaid product; ....; and

    B. ... all of the plaintiff's existing and future customers would be serviced in the same manner and at the same rates and prices; .... that defendants would not compete in [with?] the manufacture and/or distribution of said product or any likeness thereof, .... and that the defendants would at all times protect the integrity and solvency of the plaintiff's product and business; and

    C. That the defendants would not act in any manner contrary to its fiduciary capacity as a distributing agent for the plaintiff's product; and

    D. That plaintiff's business and/or its products protected by a registered patent and/or trademark and/or its mark would be accurately promoted and protected in the general market for the benefit of the plaintiff.

(Compl. ¶13 at Sub-Paragraphs (A)-(D).)

Instead of requiring an amended complaint, I directed Ms. McAlear to appear for deposition, and I warned her: "She must be prepared to state the full particulars of plaintiff's fraud claims; she must (1) specify each statement that plaintiff contends w[as] fraudulent, (2) identify the speaker of each statement, and identify each other person who was present or received the statement, (3) state when and where each statement

was made, and (4) explain why each statement was fraudulent."
(2/14/08 Memorandum and Order.)

At deposition, Ms. McAlear was asked to describe all
statements made by the Defendants on the topics set forth in
Paragraph 13 of the Complaint.  I have already quoted much of
that testimony.  She did not testify that Childcraft made the
statements alleged in Sub-Paragraphs 13(B) or 13(C).  See
particularly McAlear Depo. Tr. 53, 58, 60-61, 70-71, and 87-89.

As for the statement alleged in Sub-Paragraph 13(D), a jury
could find that Childcraft was aware of Ms. McAlear's design
patent and of Plaintiff's application seeking to register "Seat
Sack" as a trademark, but Ms. McAlear did not testify that
Childcraft stated that the design patent or the mark "would be
accurately promoted and protected."  If the law allows Plaintiff
to exclude others from using its product's design, or from using
words similar to its name "Seat Sack," then the remedy would lie
under Counts VII through XII, which I will discuss later.

As for the statement alleged in Sub-Paragraph 13(A), Ms.
McAlear did not testify that Childcraft used the word
"fiduciary."  She did testify that Ms. Scott said "that they
would do their best to sell my product."  (McAlear Depo. Tr. 67.)
However, under New York law, "a cause of action for fraud will
not arise if the alleged fraud merely relates to a breach of a
contract," and there "has been no breach of a duty owed to
plaintiff apart from that arising under the contract." *MBW
Advertising Network, Inc. v. Century Business Credit Corp.*, 173
A.D.2d 306, 569 N.Y.S.2d 682 (1st Dep't 1991).  "A cause of
action for fraud in inducing a contract cannot be based solely
upon a failure to perform contractual promises of future acts."
*C.B. Western Financial Corp. v. Computer Consoles, Inc.*, 122
A.D.2d 10, 504 N.Y.S.2d 179, 182 (2d Dep't 1986).

For all the reasons stated above, the defendants are
entitled to summary judgment on Counts I and II.

### THIRD (as to part of Count IV):
####     Plaintiff's Evidence Fails to Show
####     Misappropriation of Trade Secrets.

Part of Count IV (namely its heading) tersely alleges
misappropriation of trade secrets.  The Complaint itself sheds no
light on what "trade secrets" allegedly were misappropriated or
how the misappropriation was accomplished.  At deposition, Ms.
McAlear was asked "What trade secrets?"  She replied: "My design,
my patent, the people that we were selling it to that I had them

-19-

go directly to Childcraft." (McAlear Depo. Tr. 100.) None of those items are trade secrets.

In order to prove misappropriation of trade secrets, Plaintiff must show the misappropriation of information that is *secret*. *Lehman v. Dow, Jones & Co., Inc.*, 783 F.2d 285, 298 (2d Cir. 1986). The Seat Sack design was not a trade secret, as "secrecy is necessarily lost when the design or product is placed on the market." *Linkco, Inc. v. Fujitsu, Ltd.*, 230 F.Supp.2d 492, 498 (S.D.N.Y. 2002). Plaintiff admits that anyone holding a Seat Sack can see its design. (McAlear Depo. at Tr. 101.) Similarly, the '731 Patent is a public record available for the world to see, as Ms. McAlear again admits. (*Id.* at Tr. 103.) Childcraft did not misappropriate the names and addresses of Plaintiff's customers; Plaintiff supplied that information to Childcraft, and Plaintiff inserted the inside labels that allowed those customers to reorder directly from Childcraft. Ms. McAlear answered "no" when asked: "Are you aware of any instances in which Childcraft sold a product bearing the Seat Sack name without the permission of Seat Sack, Inc.?" (*Id.* at Tr. 105.)

By Plaintiff's own testimony, Childcraft did not misappropriate any trade secrets from Plaintiff. Accordingly, the defendants are entitled to summary judgment on the part of Count IV that alleges misappropriation of trade secrets.

**FOURTH (as to parts of Counts VII and VIII):**
    **Plaintiff's Evidence Fails to Show**
    **Design Patent Infringement.**

Count VII's heading alleges "unlawful use of Plaintiff's patented product," and Count VIII alleges "federally registered patent." The defendants' 1/27/09 memorandum, at pages 35-38, correctly read these terse portions of Counts VII and VIII to allege a claim for infringement of the design patent issued to Ms. McAlear in 1995. A copy of the design patent was annexed as Exh. B to Ms. McAlear's 3/21/07 affidavit (refiled in our Court on 7/24/07), and annexed again as Exh. A to her 2/12/09 affidavit. The design patent's claim is for "The ornamental design for sack hanging on the back of a chair, as shown." It contains six drawings, which show a very simple, unornamented, functional design.

Defendants' 1/27/09 memorandum, at pages 36-37, said: "To qualify for design patent protection, a design must have an ornamental appearance that is not dictated by function alone. *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 148 (1989). .... Design patents are narrow in scope in that

they are strictly limited to what is shown in the drawings and only protect the novel, ornamental aspects of the design as shown in the patent. *Metrokane, Inc. v. Wine Enthusiast*, 185 F.Supp.2d 321, 326 (S.D.N.Y. 2002) .... (granting summary judgment to accused infringer where design patent drawings did not disclose any ornamental aspects of patented device)."

In *Metrokane*, at page 327, Judge Conner did indeed grant summary judgment on the first of two design patents, for the simple reason that "this design has no purely ornamental features that merit patent protection." The same is true of Ms. McAlear's design patent. It contains six drawings, which show a very simple, unornamented, functional design.

The defendants' memorandum presented two additional arguments for summary judgment as to design patent infringement. A threshold argument was: Ms. McAlear had presented no evidence that she had assigned or licensed the design patent to Plaintiff (the corporation that she formed in 1999). Even if that defect could be cured, and even if the design merited some protection, the final argument was: Childcraft's Seat Pocket contains two extra pockets, as well as a name tag holder, and thus Plaintiff cannot meet "its burden of proving [that] the two designs would appear 'substantially the same' to the ordinary observer." (1/27/09 Memo., pp. 37-38, quoting *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 678 (Fed. Cir. 2008) (en banc, affirming summary judgment), *cert. denied*, 129 S.Ct. 1917 (2009).)

As to the threshold argument, Ms. McAlear's 2/12/09 affidavit at ¶3 says, "I have always authorized and assigned unto Seat Sack, Inc. the right to utilize this patent ...." However, defendants' reply memorandum at page 19 cites 35 U.S.C. §261 (assignment of a patent must be in writing to be effective) and *Bellehumeur v. Bonnet*, 127 Fed. Appx. 480, 484-85 (Fed. Cir. 2005) (party claiming oral assignment lacked standing to maintain infringement action).

Most importantly, Plaintiff has utterly failed to show that her design patent contains "novel, ornamental aspects," or that Childcraft's design appears to be "substantially the same."

Accordingly, the defendants are entitled to summary judgment on those parts of Counts VII and VIII that claim infringement of the design patent.

**FIFTH (as to Counts VIII through XII, and parts of IV and VII):**
   **Plaintiff's Evidence Fails to Show Trademark**
   **Infringement, Dilution, or Unfair Competition.**

Various counts of the Complaint allege that confusion and/or dilution has been caused by the trade name and trade dress of Childcraft's Seat Pocket, which competes with Plaintiff's Seat Sack.  Count VIII invokes 15 U.S.C. §1114, which protects a "registered mark" against infringement.  Counts IX and X both invoke 15 U.S.C. §1125(a), which is the federal statute that protects against infringement of an unregistered trademark and against unfair competition.  Counts XI and XII invoke N.Y. General Business Law §360-*l*, which provides for injunctive relief if a plaintiff proves "[l]ikelihood ... of dilution of the distinctive quality of a mark or trade name."   Count IV, as part of a claim of breach of fiduciary duty, mentioned "deceptive trade, unfair business practices, ... and unfair competition," and Plaintiff's 2/12/09 Memorandum, at pages 13-14, makes clear that Count IV was intended to invoke N.Y. General Business Law §349.  Count VII's heading mentions only the "patented product;" the text of Count VII also contains allegations about the product's alleged trademark, but those allegations add nothing to what is already contained in Count IV and Counts VIII through XII.

A.   Count IV and New York General Business Law §349

As I just noted, Plaintiff's 2/12/09 Memorandum, at pages 13-14, makes clear that Count IV was intended to invoke N.Y. General Business Law §349.  However, Judge Scheindlin has written:

> Section 349 prohibits "deceptive acts and practices" and Section 350 proscribes false advertising in commerce.  A successful claim under either statute must prove "consumer injury or harm to the public interest."  *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir. 1995).  To demonstrate such harm, a practice must be the "sort of offense to the public interest that would trigger FTC intervention under 15 U.S.C.A. §45."  *Horn's, Inc. v. Sanofi Beaute, Inc.*, 963 F.Supp. 318, 328 (S.D.N.Y. 1997) (quoting R. Givens, Practice Commentaries on N.Y. Gen. Bus. Law §349, at 567-68 (McKinney 1988)).  ....

> .... Harm to a business from a competitor, however, does not constitute the kind of detriment to the public interest required by the statutes.  *See*

*Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, No. 91 Civ. 4544, 1992 WL 170559 at *4 (S.D.N.Y. July 2, 1992) (dismissing Section 349 claim because alleged harm to plaintiff's business outweighed any incidental harm to the public).

*Savin Corp. v. The Savin Group*, 2003 WL 22451731, *15-16 (S.D.N.Y. Oct. 24, 2003). In the case at bar, just as in Judge Scheindlin's case, plaintiff has failed to produce evidence of harm to the public outweighing the alleged harm to plaintiff's business, and therefore the defendants are entitled to summary judgment on the portion of Count IV that invokes General Business Law §349.

B. <u>Count VIII and 15 U.S.C. § 1114</u>

Count VIII invokes 15 U.S.C. § 1114, which protects a "registered mark" against infringement. The U.S. Patent and Trademark Office has not granted Plaintiff a registration of "Seat Sack" as a trademark. As I noted earlier, Plaintiff applied to register the word mark "Seat Sack" as a trademark on May 15, 2000 but abandoned the application on February 5, 2002; it applied again on August 18, 2006, but registration has not been granted.

Plaintiff does not have a registered trademark for "SEAT SACK." (Schmidt Decl. ¶ 2, Ex. A.) Accordingly, the defendants are entitled to summary judgment on Count VIII.

C. <u>Counts IX and X and 15 U.S.C. §1125(a)(1)</u>

Subsection "A" of 15 U.S.C. §1125(a)(1) prohibits the "use in commerce [of] any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin" which is "likely to cause confusion . . . as to the affiliation, connection, or association" of the user with another person, "or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person[.]" 15 U.S.C. §1125(a)(1)(A). Subsection "B" of 15 U.S.C. §1125(a)(1) can impose civil liability on any person who "misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods." 15 U.S.C. §1125(a)(1)(B). Together, these provisions encompass a wide range of activities that include common-law trademark infringement (*i.e.*, infringement of unregistered marks), trade dress infringement, and unfair competition ("passing off" one's own product as that of another, false advertising, disparagement of a competitor's product, and so on).

Counts IX and X are primarily addressed to subsection "A,", namely 15 U.S.C. §1125(a)(1)(A). Defendants' 1/27/09 memorandum, at pages 25-33, correctly warned Plaintiff that it would have to submit admissible evidence showing (1) that Plaintiff has a protectible trademark or trade dress, and (2) that there is a likelihood of consumer confusion between the Seat Sack and the Seat Pocket.

> *1. Plaintiff's evidence fails to show a*
> *protectible trademark or trade dress.*

To prevail under 15 U.S.C. §1125(a)(1)(A), Plaintiff's first task is to show either (a) that its trademark or trade dress is "inherently distinctive," or (b) that its trademark or trade dress has acquired "secondary meaning," *i.e.*, "that, in the minds of the public, the primary significance" of the trademark or trade dress "is to identify the source of the product rather than the product itself." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 767 n.4, 112 S.Ct. 2753, 2756 n.4 (1992).

In *Two Pesos*, the Supreme Court wrote: "Marks are often classified in categories of generally increasing distinctiveness; following the classic formulation set out by Judge Friendly, they may be (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful. .... Marks which are merely descriptive of a product are not inherently distinctive. When used to describe a product, they do not inherently identify a particular source; ...." 505 U.S. at 768-69, 112 S.Ct. at 2757.

Plaintiff's mark is merely descriptive. As I mentioned earlier, Plaintiff chose the name "Seat Sack" because the product is a sack that works in conjunction with a seat. Likewise, Plaintiff chose names for its other products that describe the function of those products. Thus, Plaintiff sells a "File Drawer Sack," and chose the name because the product is a sack that hangs on a file drawer. Plaintiff also sells a "Locker Sack," which it named because the product is a sack that hangs inside a locker. Plaintiff's "Office Sack" was so named because it is a sack that is designed for use in an office or cubicle. The "Lock-n-Sack" is designed for use in or on a child's locker, and Ms. McAlear chose that name because that product "locked and it was a sack, and 'Sack' was my name." (McAlear Depo. Tr. 126-27.) Hence, Plaintiff's mark "Seat Sack" is not "inherently distinctive."

Nor is there anything "inherently distinctive" in the product's "trade dress" - - in the way that the words "Seat Sack"

are written on Plaintiff's product, or in the product's packaging, or in "the total visual image by which the product is presented to consumers." *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 31 (2d Cir. 1995).

Accordingly, Plaintiff must present admissible evidence that the words "Seat Sack," or the product's trade dress, have acquired "secondary meaning." On this topic, the Second Circuit has written:

> "[P]roof of secondary meaning entails vigorous evidentiary requirements," .... In determining whether a mark has acquired secondary meaning, we have examined: advertising expenditures; consumer studies linking the name to a source; sales success; unsolicited media coverage of the product; attempts to plagiarize the mark; and length and exclusivity of the mark.

*Thompson Medical Co. v. Pfizer, Inc.*, 753 F.2d 208, 217 (2d Cir. 1985) (numerous internal citations omitted).

Plaintiff has not come forward with such evidence. It has shown that the sales of the Seat Sack product to consumers rose from 1999 to 2005, but the evidence strongly indicates that the most important consumers (teachers) associated the Seat Sack product with Childcraft more than with Plaintiff. While testifying about the time period of October 2005, Ms. McAlear mentioned: "Most people know who Childcraft is. Most teachers do." (4/4/08 McAlear Depo. Tr. 152.) Childcraft's attorney Mr. Baish promptly asked follow-up questions:

Q: You said Childcraft is well known. Was *Seat Sack* an independent source of the products[,] known at that time?

MR. CARROLL [Plaintiff's attorney]: Referring to the name now, Seat Sack?

MR. BAISH: The *company* Seat Sack.

A: You mean to sell it directly to teachers?

Q: Yes.

A: *Not so much* yet, because we hadn't marketed that. We marketed it to be sold *through Childcraft*.

Q: The reality was that even as of October 2005 the vast majority of the sales of Seat Sack since its existence through October 2005 were made *through Childcraft*, right?

A: Yes.   ....

(4/4/08 McAlear Depo. Tr. 152-53, emphasis added.)  Ms. McAlear chose to use Childcraft as a distributor of the Seat Sack, and to have many customers reorder through Childcraft, even though her company was selling directly to other customers, and even though Childcraft was selling thousands of educational products supplied by hundreds of vendors.

In sum, the evidence, even taken in the light most favorable to Plaintiff, fails to show that Plaintiff's trademark and/or trade dress acquired "secondary meaning," *i.e.*, "that, in the minds of the public, the primary significance" of Plaintiff's trademark or trade dress was "to identify the source of the product rather than the product itself."  *Two Pesos*, 505 U.S. 763, 767 n.4, 112 S.Ct. 2753, 2756 n.4 (1992).

Accordingly, Plaintiff's evidence fails to show the first essential element under 15 U.S.C. §1125(a)(1)(A), namely, a protectible trademark or trade dress.  It is not necessary to discuss the second essential element, namely, whether the evidence shows a likelihood of consumer confusion between the Seat Sack and the Seat Pocket.

It is unclear whether Counts IX and X intend to invoke subsection B of 15 U.S.C. §1125(a)(1), which can impose liability on any person who "misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods."  15 U.S.C. § 1125(a)(1)(B).

Count IX (at ¶62) and Count X (at ¶70) each allege that Childcraft "misrepresented and falsely described to the general public the source of origin of the bootleg merchandise," *i.e.*, the Seat Pocket.  (Compl. ¶ 70.)  I note that the "source of origin" seems to be referring to word "origin" in 15 U.S.C. §1125(a)(1)(A).  It is not the same as "geographic origin," which is the phrase used in 15 U.S.C. §1125(a)(1)(B).  In any event, Plaintiff's evidence does not show that the defendants misrepresented the "nature, characteristics, qualities, or geographic origin" of the Seat Sack or of the Seat Pocket.

For all the reasons stated above, the defendants are entitled to summary judgment on Counts IX and X.

D.  Counts XI and XII and New York's General Business
Law §360-l.

Counts XI and XII invoke New York's General Business Law
§360-l, which was also mentioned in passing in Counts VII and
VIII.  Gen. Bus. Law §360-l (formerly §368-d) offers protection
against "dilution of the distinctive quality of a mark or trade
name."  However, the high court of New York held that this
statute protects "only those trade names which are truly of
distinctive quality or which have acquired a secondary meaning in
the mind of the public."  *Allied Maintenance Corp. v. Allied
Mechanical Trades, Inc.*, 42 N.Y.2d 538, 546, 399 N.Y.S.2d 628,
633 (Ct. App. 1977).  The Second Circuit reads the *Allied*
decision as indicating that "the anti-dilution statute protects
only extremely strong marks."  *Sally Gee, Inc. v. Myra Hogan,
Inc.*, 699 F.2d 621, 625 (2d Cir. 1983).

For all the reasons discussed above, Plaintiff's evidence
fails to show that it is the owner of trade name which is "truly
of distinctive quality" or has "acquired a secondary meaning in
the mind of the public."  Accordingly, the defendants are
entitled to summary judgment on Counts XI and XII.

## CONCLUSION

For the reasons set forth in today's Opinion and Order, I
deny the defendants' motion to strike (Doc. #70), I grant the
defendants' motion for summary judgment (Doc. #50), and I deny
Plaintiff's cross-motion for summary judgment (Doc. #59).  I am
today entering a Final Judgment in favor of the defendants.

DOUGLAS F. EATON
United States Magistrate Judge
500 Pearl Street, Room 1360
New York, New York 10007
Telephone: (212) 805-6175
Fax: (212) 805-6181 fax

Dated:    New York, New York
          January 22, 2010

Copies of this Opinion and Order are being sent by electronic
filing and by mail to:

-27-

Edward J. Carroll, III, Esq.
Law Office of Edward J. Carroll
2733 Route 209
Kingston, NY 12401

David M. Fine, Esq.
Orrick, Herrington & Sutcliffe LLP (NYC)
666 Fifth Avenue
New York, NY 10103

Anthony S. Baish, Esq.
Godfrey & Kahn, S.C.
780 North Water Street
Milwaukee, WI 533202-3590